**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:09-CV-00480 |
| AUTOMATIC ELEVATOR COMPANY, INC. and DUKE UNIVERSITY HEALTH SYSTEM, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

**Auld, Magistrate Judge**

This matter comes before the Court on the Motion for Summary Judgment by Duke University Health System, Inc. (Docket Entry 27) and Plaintiff Mitsui Sumitomo Insurance Company of America's Motion for Summary Judgment (Docket Entry 29). For the reasons set forth herein, the Court will deny summary judgment for Duke University Health System, Inc. ("Duke") and will grant summary judgment for Mitsui Sumitomo Insurance Company of America ("Mitsui Sumitomo").[1]

## Background

### I. Procedural Background

Mitsui Sumitomo and Duke seek a declaration of Mitsui Sumitomo's obligations under two insurance policies issued to Automatic Elevator and, to that end, have reached a stipulation of facts. (See Docket Entry 23.) The first policy (the "03-04

---

[1] Mitsui Sumitomo and Duke consented to disposition of this case pursuant to 28 U.S.C. § 636(c). (See Docket Entry 35.) Automatic Elevator Company, Inc. ("Automatic Elevator") declined to file an answer, notwithstanding proper service. (See Docket Entries 19, 21.)

Policy") was effective from August 1, 2003, to August 1, 2004. (Docket Entry 23-2 at 1.) The second policy (the "04-05 Policy") was effective from August 1, 2004, to August 1, 2005. (Docket Entry 23-3 at 1.)[2] The Policies include a $1 million per occurrence limit and a $3 million aggregate limit (the "General Aggregate Limit"). (Docket Entry 23-2 at 8; Docket Entry 23-3 at 8.) An endorsement attached to each Policy entitled "Amendment - Aggregate Limits of Insurance (Per Elevator)" (the "Per Elevator Amendment") states that the General Aggregate Limit applies to each elevator. (Docket Entry 23-2 at 33; Docket Entry 23-3 at 33.)

Duke is pursuing claims for negligence and breach of contract against Automatic Elevator in the General Court of Justice, Superior Court Division, in Wake County, North Carolina, in a case styled Duke University Health System, Inc. v. Automatic Elevator Company, Inc., Case No. 08 CVS 011270 (the "Duke Indemnity Action"). That case arises from the mistaken application of used elevator hydraulic fluid in the cleaning of surgical instruments later utilized in surgeries at two facilities owned and/or operated by Duke - Duke Health Raleigh Hospital ("Duke Health") and Durham Regional Hospital ("Durham Regional"). (See Docket Entry 23.)[3]

---

[2] Because the relevant terms of the 03-04 Policy and the 04-05 Policy are identical, the Court will use the generic term "Policy" and the collective term "Policies" at times.

[3] Duke, through its filings with this Court, has not explicitly described its relationship with Duke Health and Durham Regional, but did address the matter in its complaint filed in the Duke Indemnity Action. (See Docket Entry 10-2, ¶ 1 ("[Duke University Health Systems, Inc.] owns and/or operates Duke University Hospital, Durham Regional Hospital [], and Duke Health Raleigh Hospital [] (continued...)

This case began when Mitsui Sumitomo filed its Complaint seeking a declaratory judgment regarding its obligations to Automatic Elevator in the Duke Indemnity Action. (Docket Entry 1.) Mitsui Sumitomo subsequently filed an Amended Complaint. (Docket Entry 10.) That Amended Complaint asks this Court to declare that: (1) Mitsui Sumitomo does not have a duty to defend or indemnify Automatic Elevator with respect to the Duke Indemnity Action under the 03-04 Policy (id., ¶ 54(a)); (2) the underlying claims of the Duke Indemnity Action involve one "occurrence" as defined under the 04-05 Policy (id., ¶ 54(b)); (3) the available limit under the 04-05 Policy has been exhausted by settlement of the Underlying Claims (id., ¶ 54(c)); and (4) Mitsui Sumitomo has no further duty to defend or to indemnify Automatic Elevator with respect to the Duke Indemnity Action under the 04-05 Policy (id., ¶ 54(d)).[4]

## II. Factual Background

### A. Stipulated Facts

Automatic Elevator worked with Duke on various elevator projects from 1978 through 2004. (Docket Entry 23, ¶ 5.) In January of 2004, Duke issued a purchase order to Automatic Elevator

---

[3](...continued)
(formerly known as Raleigh Community Hospital).").) In addition, in its Answer, Duke admitted an allegation in Mitsui Sumitomo's Amended Complaint describing the facilities in question as "two Duke hospitals." (See Docket Entry 10, ¶ 18; Docket Entry 17, ¶ 18.)

[4] The Policy provides that Mitsui Sumitomo's "right and duty to defend ends when [Mitsui Sumitomo has] used up the applicable limit of insurance in the payment of judgments or settlements" under the applicable policy sections. (Docket Entry 23-3 at 11.) A finding that the limits of the relevant Policy have been exhausted by Mitsui Sumitomo's prior $1 million settlement payments (see Docket Entry 23, ¶ 25) necessarily leads to a finding in favor of Mitsui Sumitomo on this issue as well.

to renovate two elevators located in the parking deck of Duke Health. (<u>Id.</u>, ¶ 6.) Automatic Elevator commenced work on the first elevator ("Elevator 1") in April of 2004. (<u>Id.</u>, ¶ 7.) During the course of its work, Automatic Elevator removed used hydraulic fluid from Elevator 1 and stored it in empty 15 gallon plastic barrels that Duke had made available to Automatic Elevator. (<u>Id.</u>) These plastic barrels previously contained surgical cleaning and lubricating solutions, including surgical detergents known as Mon Klenz and Klenzyme and a surgical lubricant known as Hinge Free, which Duke had purchased from Cardinal Health 200, Inc. ("Cardinal"). (<u>Id.</u>)

Automatic Elevator completed its work on Elevator 1 in June 2004. (<u>Id.</u>, ¶ 8.) As part of its work on Elevator 1, Automatic Elevator employees transported the barrels containing used hydraulic fluid to a waste disposal site, where the barrels were poured out. (<u>Id.</u>) The interiors of the barrels were not cleaned after disposal of the used hydraulic fluid from Elevator 1. (<u>Id.</u>) On June 4, 2004, the North Carolina Department of Labor inspected and approved Automatic Elevator's work on Elevator 1. (<u>Id.</u>, ¶ 9.)

In July 2004, Automatic Elevator commenced work on the second elevator ("Elevator 2"). (<u>Id.</u>, ¶ 10.) As part of its work, Automatic Elevator removed used hydraulic fluid from Elevator 2 and stored it in the same plastic barrels that had been used to store the hydraulic fluid removed from Elevator 1. (<u>Id.</u>) The barrels were then stored in an area of the Duke Health parking deck which

had been designated as Automatic Elevator's equipment storage/work area by Duke Health representatives.  (<u>Id.</u>)

Automatic Elevator completed its work on Elevator 2 on or around September 15, 2004.  (<u>Id.</u>, ¶ 11.)  The 15 gallon plastic barrels containing used hydraulic fluid were left in Automatic Elevator's designated storage area in the Duke Health parking deck for pick up at a later time.  (<u>Id.</u>)  The barrels were wrapped in plastic shrink wrap and were placed on a loading pallet. (<u>Id.</u>)  On September 15, 2004, Elevator 2 was inspected and was approved by the North Carolina Department of Labor.  (<u>Id.</u>)

In late September 2004, a Duke Health employee observed the plastic barrels and mistakenly believed that they were unopened containers of surgical detergents and/or lubricants supplied to Duke Health by Cardinal.  (<u>Id.</u>, ¶ 12.)  The Duke Health employee requested that Cardinal pick up the plastic barrels and return them to Cardinal's warehouse.  (<u>Id.</u>)  On or about October 2, 2004, Cardinal employees picked up the plastic barrels from the Duke Health parking deck.  (<u>Id.</u>, ¶ 13.)

On November 4, 2004, Cardinal sold and delivered a barrel labeled as "Mon Klenz" to Duke Health.  (<u>Id.</u>, ¶ 14.) However, this barrel contained used hydraulic fluid.  (<u>Id.</u>)  On November 9, 2004, Cardinal sold and delivered a second barrel labeled as "Mon Klenz" to Duke Health.  (<u>Id.</u>)  This barrel also contained used hydraulic fluid.  (<u>Id.</u>)  On November 24, 2004, Cardinal sold and delivered two barrels labeled as "Mon Klenz" to a separate hospital owned and/or operated by Duke, Durham Regional.  (<u>Id.</u>)  These barrels

contained used hydraulic fluid as well.  (<u>Id.</u>)  All the foregoing barrels were sold by Cardinal under the mistaken impression that they contained surgical detergents and lubricants.  (<u>Id.</u>)

Duke Health and Durham Regional mistakenly used the hydraulic fluid to clean surgical instruments.  (<u>Id.</u>, ¶ 15.)  Hundreds of surgical instruments were exposed to the used hydraulic fluid at Durham Regional in December 2004 through the instrument washing process.  (<u>Id.</u>, ¶ 16.)  At Durham Regional, the used hydraulic fluid was used in the cleaning process in three different washing machines.  (<u>Id.</u>)  Similarly, hundreds of surgical instruments were exposed to hydraulic fluid at Duke Health in November and December 2004 through the instrument washing process.  (<u>Id.</u>, ¶ 17.)  At Duke Health, the used hydraulic fluid was used in the cleaning process in two different washing machines.  (<u>Id.</u>)  On December 22, 2004, employees of Durham Regional discovered that the plastic barrels, which supposedly contained surgical detergents, actually contained used hydraulic fluid.  (<u>Id.</u>, ¶ 18.)  On December 29, 2004, the same discovery was made at Duke Health.  (<u>Id.</u>)

On January 4, 2005, Duke sent a letter to 3,650 patients who may have had surgical procedures using the instruments that had been washed in hydraulic fluid advising them of the situation. (<u>Id.</u>, ¶ 19.)  On February 23, 2005, the North Carolina Department of Labor, Division of Occupational Safety and Health, issued a citation to Automatic Elevator, categorized as "Non-Serious," based on Automatic Elevator's failure to properly dispose of the barrels containing used hydraulic fluid removed from Elevator 2.  (<u>Id.</u>,

-6-

¶ 20.) Automatic Elevator did not contest this citation and complied with instructions for remediation. (Id.)

After Duke issued its letter of January 4, 2005, approximately 150 patients asserted claims against Duke, Cardinal and Automatic Elevator alleging various injuries resulting from potential exposure to hydraulic fluid. (Id., ¶ 21.) The theories of liability asserted against Duke, Cardinal and Automatic Elevator included negligence, negligent infliction of emotional distress and loss of consortium. (Id., ¶ 22.)

On or about January 5, 2005, Automatic Elevator tendered some of the underlying claims to Mitsui Sumitomo for defense and indemnity. (Id., ¶ 23.) In response, Mitsui Sumitomo provided a defense to Automatic Elevator under the 04-05 Policy. (Id., ¶ 24.) In May 2008, Mitsui Sumitomo made available $1 million under the 04-05 Policy for payment of Automatic Elevator's settlement of the underlying claims. (Id., ¶ 25.)

As of May 2008, Duke entered into settlement agreements with approximately 127 claimants resolving any and all liability for an amount in excess of $6 million. (Id., ¶ 27.) Thirty-eight of the 127 claims settled by Duke arose out of surgeries performed at Durham Regional. (Id., ¶ 28.) These surgeries took place at various times between November 30, 2004, and December 24, 2004. (Id.) Eighty-nine patient claims settled by Duke arose out of surgeries performed at Duke Health. (Id., ¶ 29.) These surgeries took place at various times between November 5, 2004, and December 30, 2004. (Id.)

Under the Policies, coverage for claims due to bodily injury or property damage arises only if "(1) [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; [and] (2) [t]he 'bodily injury' or 'property damage' occurs during the policy period . . . ." (Docket Entry 23-2 at 10; Docket Entry 23-3 at 11.)[5] A "bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Docket Entry 23-2 at 22; Docket Entry 23-3 at 23.) An "occurrence" is defined as "an accident, including continuous repeated exposure to substantially the same general harmful conditions." (Docket Entry 23-2 at 23; Docket Entry 23-3 at 24.) The term "accident" is not defined in either Policy. (Docket Entry 23-2 at 21; Docket Entry 23-3 at 22.)

Both Policies contain a $1 million limit per occurrence for claims due to bodily injury for which the insured is liable. (Docket Entry 23-2 at 8; Docket Entry 23-3 at 8.) Further, the Policies contain a General Aggregate Limit of $3 million. (Docket Entry 23-2 at 8; Docket Entry 23-3 at 8.) The Per Elevator Amendment attached to each Policy states that the General Aggregate Limit applies to each elevator or escalator, which is clarified to mean "each and every elevator or escalator that is either serviced, repaired, installed, renovated, refurbished or worked upon by you

---

[5] The parties have not disputed that the incident(s) in question happened within the applicable "coverage area." (See Docket Entries 28, 30.)

or your behalf during the policy period." (Docket Entry 23-2 at 33; Docket Entry 23-3 at 33.)

## Discussion

### I. Legal Standard

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The Court must view the evidence and any reasonable inferences therefrom in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party may discharge its burden by identifying an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Matsushita Elec., 475 U.S. at 586-87 (citation omitted) (emphasis in original). In this regard, the nonmoving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the nonmoving party. Anderson, 477 U.S. at 252 (citation omitted).

"Since federal jurisdiction here depends on diversity of citizenship, the applicable law must be determined by the choice of law rules of the forum state, North Carolina." Brendle v. General

-9-

Tire & Rubber Co., 408 F.2d 116, 116 (4th Cir. 1969); accord Burris Chem., Inc. v. USX Corp., 10 F.3d 243, 245 n.7 (4th Cir. 1993). "Because the policy at issue was executed in North Carolina, the law of that forum controls." Rogers v. Penn Nat'l Ins. Co., 193 Fed. Appx. 263, 265 (4th Cir. 2006) (citing Tanglewood Land Co. v. Byrd, 299 N.C. 260, 261 S.E.2d 655, 656 (1980)); see also N.C. Gen. Stat. § 58-3-1 ("All contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof.").

"[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." West v. American Tel. & Tel. Co., 311 U.S. 223, 236 (1940). However, "[a] state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them." Id. Accordingly, "it is the duty of [a federal court facing a question of state law] to ascertain from all the available data what the state law is and apply it . . . ." Id. at 237. "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum

for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." <u>Id.</u>

## II. Analysis

In order to address the parties' cross-motions for summary judgment and to determine the obligations of Mitsui Sumitomo under the 03-04 Policy and the 04-05 Policy, this Court must address the following issues: (1) whether the incident involves claims under the 03-04 Policy; (2) whether Automatic Elevator's work on two separate elevators as part of a single project renders the Per Elevator Amendment applicable; and (3) whether the facts as stipulated constitute a single occurrence or multiple occurrences.

### A.  Applicability of the 03-04 Policy

Mitsui Sumitomo has urged the Court to find that "Mitsui Sumitomo does not have a duty to defend or indemnify Automatic Elevator with respect to the Duke Indemnity Action under the 03-04 Policy." (Docket Entry 10, ¶ 54(a).)[6]  The Court agrees.

"[A]n insurance policy is a contract and its provisions govern the rights and duties of the parties thereto." <u>Fidelity Bankers Life Ins. Co. v. Dortch</u>, 318 N.C. 378, 380, 348 S.E.2d 794, 796

---

[6] If the 03-04 Policy applied, in addition to any obligations it faces under the 04-05 Policy, Mitsui Sumitomo would be obligated to the extent of the relevant limits in the 03-04 Policy.  As the policy limits in the 03-04 Policy and 04-05 Policy are the same (<u>see</u> Docket Entry 23-2 at 8; Docket Entry 23-3 at 8), Mitsui Sumitomo's obligations would effectively double.  Duke has argued only briefly for application of the 03-04 Policy on the instant facts (<u>see</u> Docket Entry 33 at 6-9), and has noted that it believes the "better approach" is to find that multiple occurrences and the Per Elevator Amendment under the 04-05 Policy result in $6 million of available coverage (<u>id.</u> at 9).

(1986).  "[T]he intention of the parties controls any interpretation or construction of the contract, and intention must be derived from the language employed." Id. Both the 03-04 and the 04-05 Policies state that they apply if "[t]he 'bodily injury' or 'property damage' occurs during the policy period . . . ." (Docket Entry 23-2 at 10; Docket Entry 23-3 at 11.)  The language of the policy is clear and should be afforded its plain meaning. The only relevant consideration in assessing the applicability of the 03-04 Policy is whether the bodily injury occurred during the effective period of that Policy.

Based on the facts as stipulated, the bodily injury occurred outside the period of the 03-04 Policy, making that Policy inapplicable.  The 03-04 Policy was effective from August 1, 2003, to August 1, 2004. (Docket Entry 23, ¶ 4.)  Cardinal sold Duke the barrels containing the used hydraulic fluid on November 4, 2004. (Id., ¶ 14.)  The earliest exposure of the surgical instruments to the used hydraulic fluid happened in November 2004.  (Id., ¶ 17.) The surgeries using the instruments exposed to the used hydraulic fluid took place between November 5, 2004, and December 30, 2004. (Id., ¶¶ 28, 29.)  Accordingly, all bodily injury happened outside the August 1, 2004, end date of the 03-04 Policy.  The Court therefore finds that Mitsui Sumitomo does not have a duty to defend or to indemnify Automatic Elevator with respect to the Duke Indemnity Action under the 03-04 Policy.

B.  Applicability of the Per Elevator Amendment

Duke has argued that the Per Elevator Amendment should apply in the present case to expand Mitsui Sumitomo's General Aggregate Limit to $6 million under the 04-05 Policy.  The Court disagrees.[7]

The Per Elevator Amendment expands the 04-05 Policy's General Aggregate Limit to apply to "each elevator or escalator away from premises owned or rented by [Automatic Elevator]."  (Docket Entry 23-3 at 33.)  It further clarifies that: "With respect to this Endorsement, elevator or escalator means each and every elevator or escalator that is either serviced, repaired, installed, renovated, refurbished or worked upon by you or your behalf during the policy period." (Docket Entry 23-3 at 33.)

Duke has presented two separate arguments for its position that Automatic Elevator's work on Elevator 1 should trigger the Per Elevator Amendment.  The first states, "[t]he simplest and most straightforward way of interpreting the [Per Elevator] Amendment is to find that where two elevators are worked on as part of a project in a given policy year, and liability arises from the joint work on the two elevators, then there is a combined aggregate of $6,000,000 coverage."  (Docket Entry 28 at 18.)  The second argues:

> A more detailed analysis assessing the actual contents of the barrels yields the same result. In June 2004 when [Automatic Elevator] employees transported the barrels containing used hydraulic fluid removed from [Elevator 1] to the waste disposal site for dumping, the interiors of

[7] The Court notes that a discussion of the Per Elevator Amendment becomes moot should the Court find only a single occurrence. This discussion provides alternate grounds for finding the Per Elevator Amendment inapplicable on the instant facts, even if the facts established multiple occurrences.

-13-

the barrels were not cleaned after disposal of the used
hydraulic fluid. This necessarily means that when the
barrels were returned to the job site for reuse in
[Elevator 2], there was a residue of the hydraulic fluid
from [Elevator 1] which was then combined with the
hydraulic fluid emptied from [Elevator 2]. Thus, in
September 2004 when [Automatic Elevator] left the barrels
behind at the job site, they were leaving barrels which
contained comingled [sic] physical waste products of the
work on both [Elevator 1 and Elevator 2].

(Id. at 19 (internal citations omitted).)  The Court finds both

arguments unpersuasive.

First, the plain language of the Policy is inconsistent with

the interpretation offered by Duke in light of the stipulated

facts.  The stipulated facts state that "Automatic Elevator's work

on Elevator []1 was completed in June 2004." (Docket Entry 23,

¶ 8.)  Further, "[o]n June 24, 2004, Automatic Elevator's work on

Elevator []1 was inspected and approved by the North Carolina

Department of Labor."  (Docket Entry 23, ¶ 9.)  The 04-05 Policy

did not take effect until August 1, 2004.  (Id., ¶ 4.)  The plain

language of the Policy thus leads to the conclusion that, because

only one elevator was "either serviced, repaired, installed,

renovated, refurbished or worked upon by [Automatic Elevator] or

[Automatic Elevator's] behalf during the policy period," the Per

Elevator Amendment is inapplicable.  (Docket Entry 23-2 at 33

(emphasis added).)

Duke's first argument attempts to broaden the language of the

Per Elevator Amendment to apply to work on projects during the

policy period whose scope involved work on multiple elevators,

regardless of whether or not work on the individual elevator took

place during the policy period.  This interpretation conflicts with the plain language of the Policy.  Duke's second argument, that residue from Automatic Elevator's work on Elevator 1 commingled with residue from Elevator 2 and therefore triggered the amendment, does not address the fact that Elevator 1 was not "either serviced, repaired, installed, renovated, refurbished or worked upon . . . during the policy period."  (Id.)

In addition, both of Duke's arguments seemingly confuse the issue of interpretation of the Policy with issues of negligence by Automatic Elevator on the underlying claims.  Questions of whether residue left in the barrels from Automatic Elevator's work on Elevator 1 constituted a joint cause of the incident, or whether Automatic Elevator's liability arises from its joint work on the two elevators over the course of a single project, are independent from considerations of Mitsui Sumitomo's obligations under the Policy on the instant facts.  A determination of whether the Per Elevator Amendment would apply had both elevators been serviced during the policy period is not before this Court.  Mitsui Sumitomo's obligations arise only to the extent the Policy with Automatic Elevator allows.  Again, because only Elevator 2 was "serviced, repaired, installed, renovated refurbished or worked upon" during the 04-05 Policy period, the Per Elevator Amendment is inapplicable.  (Id.)

Duke has offered a final contention that the Per Elevator Amendment is ambiguous.  (Docket Entry 28 at 19.)  As Duke has pointed out (id.), the North Carolina Supreme Court has declared

-15-

that: "The words used in the policy having been selected by the insurance company, any ambiguity or uncertainty as to their meaning must be resolved in favor of the policy holder, or the beneficiary, and against the company." Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970). As previously discussed (see supra, pp. 14-15), the language contained in the Per Elevator Amendment is clear and thus no ambiguity exists that would warrant invocation of the foregoing doctrine.

For the foregoing reasons, the Court finds the Per Elevator Amendment inapplicable on the instant facts.

C. Interpretation of "Occurrence" under the Cause Approach

Mitsui Sumitomo and Duke dispute the correct interpretation of an occurrence under the 04-05 Policy for purposes of applying the proper Policy limit. The Policy itself defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Docket Entry 23-3 at 23.) The term accident is left undefined. (Id. at 22.)

According to Mitsui Sumitomo, the stipulated facts describe a single occurrence under the cause approach adopted by courts of North Carolina. (Docket Entry 30 at 2.) More specifically, Mitsui Sumitomo has identified that occurrence as Automatic Elevator's "alleged negligence in failing to properly dispose of waste created in the course of its maintenance work performed on one elevator." (Id.) Duke, in contrast, has contended both that (1) Automatic Elevator's decision to leave the barrels in the parking deck, "standing alone," cannot constitute an occurrence under the terms

-16-

of the contract, as it fails to satisfy the definition of an "accident" under North Carolina law (see Docket Entry 28 at 12; Docket Entry 32 at 3-4) and (2) the cause approach, as applied by North Carolina courts, looks to the immediately preceding cause(s) of harm (see Docket Entry 28 at 9-13). Thus, because Automatic Elevator's alleged negligence resulted in the use of hydraulic-fluid-washed instruments in "127 surgeries, performed on different individuals at different times and at different hospitals over a two month period, there were 127 different occurrences." (Docket Entry 28 at 12.)

### i. Automatic Elevator's Actions as an "Occurrence"

Duke first has asserted that Automatic Elevator's decision to leave the barrels in the parking deck, "standing alone," failed to qualify as an accident (and therefore cannot constitute an occurrence) under the definitions supplied by North Carolina case law "because it did not cause any injury" (Docket Entry 28 at 12) and was not unforeseen or unintended (Docket Entry 32 at 3). The Court disagrees.

The North Carolina Supreme Court has defined the term accident as "an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty." Tayloe v. Hartford Acc. & Indem. Co., 257 N.C. 626, 627, 127 S.E.2d 238, 239 (1962) (internal citations omitted); see also Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 302, 524

S.E.2d 558, 564 (2000) (defining accident as "an unplanned and unforeseen happening or event, usually with unfortunate consequences"). Moreover, the North Carolina Court of Appeals has explained that:

> "[t]he test should be a 'subjective one, from the standpoint of the insured, and not an objective one asking whether the insured "should have" expected the resulting damage,' i.e., whether the resulting damage was unexpected or unintended, not whether the act itself was unintended. An 'expected or intended' exclusion applies only 'if the resulting injury as well as the act were intentional.'"

McCoy v. Coker, 174 N.C. App. 311, 316, 620 S.E.2d 691, 695 (2005) (quoting Washington Housing Auth. v. North Carolina Housing Auths., 130 N.C. App. 279, 285, 502 S.E.2d 626, 630, disc. review denied, 526 S.E.2d 477 (1998)).

Applying these principles, Automatic Elevator's alleged negligence in the handling of the barrels constitutes an accident for purposes of interpreting an occurrence. A completely volitional act can qualify as an accident because the focus is whether the insured intended the consequences of the act. Here, the resulting surgeries using contaminated surgical instruments were an unforeseen and unintended consequence of the decision to leave the barrels of used hydraulic fluid on the loading pallet. Further, it would appear clear that damages did in fact result from this action. To argue otherwise would call into question the basis for the underlying claims against the insured. Moreover, Duke has not cited, and this Court has not located, authority defining an

accident solely as the direct or immediate cause of harm and the
Court declines to make such a distinction in this context.

### ii. The Cause Approach

#### a. Decisions Applying North Carolina Law

Having determined that the alleged negligence of Automatic
Elevator constitutes an accident for purposes of interpreting the
term occurrence, a question remains as to whether that negligence
represents the sole occurrence or whether each of the 127 surgeries
constitutes a separate occurrence.

Courts have disagreed on the best approach for determining an
occurrence in disputes regarding insurance coverage policy limits.
A Louisiana appellate court recently described the matter as
follows:

> Most liability policies contain a policy limits clause
> stating that the insured's liability is limited to a
> specified amount. This policy limit may apply to each
> "occurrence" or "accident." While there is usually no
> doubt about the number of policy limits in a given case,
> the question of what constitutes a single "occurrence" or
> "accident" within the meaning of the policy limits clause
> in a liability insurance policy arises when the insured
> has damaged several individuals, each of whose claims
> exceeds the policy limit amount, or the insured has
> damaged several pieces of property all owned by the same
> individual or entity, but with damage to each item
> exceeding the policy limit amount, or the insured has
> committed several acts of negligence which have each
> independently damaged one individual. In determining
> whether a single policy limit or multiple policy limits
> should be applied to a particular situation, "occurrence"
> and "accident" have been defined by courts across the
> nation in three ways. The majority of courts have
> adopted the general view that, to determine whether there
> is a single or multiple occurrence or accident within the
> meaning of the policy limits clause of a liability
> policy, one must look to the cause or causes of the
> accident or occurrence. Other courts have looked to the
> effect of the accident or occurrence, making the entire

> policy limits available to each injured or damaged party.
> A third group of courts has held that the phrase "per
> occurrence" in a limitation of liability clause in a
> liability policy refers, not to the cause of the
> occurrence or to the effect, but to the event that
> triggered liability.

Washington v. McCauley, 62 So. 3d 173, 180-81 (La. Ct. App. 2011)
(citing What Constitutes Single Accident or Occurrence within
Liability Policy Limiting Insurer's Liability to a Specified Amount
per Accident or Occurrence, 64 A.L.R.4th 668).

In Christ Lutheran Church v. State Farm Fire and Cas. Co., 122
N.C. App. 614, 471 S.E.2d 124 (1996), the North Carolina Court of
Appeals adopted the cause approach for determining an occurrence.
The court had to determine whether a series of twenty-four
embezzlements from church funds over the course of several weeks by
the same individual constituted a single occurrence or multiple
occurrences for purposes of per occurrence policy limitations. Id.
at 614, 471 S.E.2d at 125. The term occurrence in the relevant
insurance policy appeared as follows: "All loss involving a single
act, or series of related acts, caused by one or more persons is
considered one occurrence." Id. at 616, 471 S.E.2d at 125. In
analyzing the issue before it, the court applied the standard that
"an occurrence is determined by the cause or causes of the
resulting injury." Id. at 617, 471 S.E.2d at 126 (internal
quotation marks and citations omitted). Under this cause approach,
the court classified the twenty-four separate acts of embezzlement
as a single occurrence. Id. at 618, 471 S.E.2d at 126. In so
holding, the court noted: "These checks were all written in

furtherance of one employee's dishonest acts. They do not constitute new and individual acts of dishonesty, as alleged by plaintiff, but are instead a continuum of wrongful actions." Id. at 617, 471 S.E.2d at 126.

The North Carolina Supreme Court subsequently addressed a dispute over what constitutes an occurrence and likewise applied the cause approach, but did so in the context of determining what triggered an insurance policy. See Gaston Cnty., 351 N.C. at 299, 524 S.E.2d at 562-63. The case involved a malfunction in a pressure vessel which caused the contamination of over sixty tons of contrast media dye over a two-month period. Id. at 295, 524 S.E.2d at 560. The manufacturer was sued for defects in the design and manufacture of the vessel. Id. Among other questions, the court considered whether there were multiple occurrences so as to trigger multiple policies over different policy periods or a sole occurrence. Id. at 299, 524 S.E.2d at 562-63 ("We must decide . . . whether there was a single occurrence or multiple occurrences triggering the first policy year, the second policy year, or both . . . .") Without discussing the possibility of the manufacturing defect serving as the occurrence, the court pinpointed the failure of the vessel itself, rather than the ongoing leakage, as the sole occurrence triggering policy coverage. Id. at 304, 524 S.E.2d at 565. Specifically the court stated that, "[i]n determining whether there was a single occurrence or multiple occurrences, we look to the cause of the property damage rather than to the effect." Id. at 303, 524 S.E.2d at 565.

In <u>Western World Ins. Co. v. Wilkie</u>, No. 5:06-CV-64-H, 2007 WL 3256947 (E.D.N.C. Nov. 7, 2007), the Eastern District of North Carolina applied <u>Christ Lutheran</u> and <u>Gaston Cnty.</u> to determine the number of occurrences in a multiple injury scenario for purposes of determining insurer coverage under a per occurrence limit. <u>Wilkie</u> involved a petting zoo at which several minor defendants were infected with E.Coli over the course of a ten-day fair. <u>Id.</u> at *1. The insurance policy involved in that matter, as in the instant facts, defined occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." <u>Id.</u> The defendant urged the court to find each act of negligence, including "failure to properly clean the zoo area, failure to use a barricade to separate the animals from the children, failure to prevent hand-to-mouth activities, inadequate signage, and failure to provide proper hand washing stations," as a separate occurrence. <u>Id.</u> at *3. The plaintiff, however, argued that the insured's actions constituted a "single continuum of negligent acts." <u>Id.</u>

After reviewing North Carolina case law on the matter, and taking note of the "cause test" as adopted by <u>Christ Lutheran</u>, the court described differing applications of this approach: "Some courts (1) examine the earliest proximate cause, while others (2) focus on the incident giving rise to liability." <u>Id.</u> at *3. The court then turned to authority from other jurisdictions and found persuasive guidance from a line of cases applying the cause approach to various torts. <u>See</u> <u>id.</u> at *4 (citing, *inter alia*,

-22-

<u>Sunoco, Inc. v. Illinois Nat'l Ins. Co.</u>, 226 Fed. Appx. 104 (3d Cir. 2007) (holding that exposure of multiple plaintiffs to harmful gasoline additive, in multiple places and at different times, constituted single occurrence); <u>Chemstar, Inc. v. Liberty Mut. Ins. Co.</u>, 41 F.3d 429 (9th Cir. 1994) (treating failure to warn of product's unsuitability for indoor use as single occurrence; use by twenty-eight plaintiffs did not result in multiple occurrences); <u>Appalachian Ins. Co. v. Liberty Mut. Ins. Co.</u>, 676 F.2d 56 (3d Cir. 1982) (ruling that multiple instances of discrimination were not multiple occurrences; promulgation of discriminatory policy was single occurrence); <u>Uniroyal v. Home Ins. Co.</u>, 707 F. Supp. 1368 (E.D.N.Y. 1988) (finding single occurrence from manufacturer's delivery of "Agent Orange" to military)). The court ultimately found a sole occurrence, holding that "[t]he presence of E.Coli at the petting zoo is the general harmful condition to which defendants were exposed, and the cause of this condition was [the insured's] ongoing negligence." <u>Id.</u> at *5.

<u>b. Case Law from Other Jurisdictions</u>

In addition to cases interpreting North Carolina law on the subject, the parties have cited several cases from other jurisdictions in support of their respective positions. (<u>See</u> Docket Entry 28 at 16-17; Docket Entry 30 at 14-16.)

The opinion in <u>Koikos v. Travelers Ins. Co.</u>, 849 So.2d 263 (Fla. 2003), best presents Duke's view. In <u>Koikos</u>, two men sustained gun shot wounds as a result of an altercation at a fraternity graduation party at a restaurant. <u>Id.</u> at 265. Two

-23-

separate but nearly concurrent shots were fired. Id. The restaurant owner was subsequently sued for providing inadequate security. Id. In a declaratory judgment action against the restaurant owner's insurer, the Supreme Court of Florida considered whether each separate gun shot causing injury constituted an occurrence under the applicable policy, or whether the negligence of the owner in providing inadequate security represented the sole occurrence. Id. The policy in question defined occurrence in the same manner as in the instant case. Id. at 266.

In its holding, the court stated: "We conclude, consistent with the 'cause theory,' that in the absence of clear language to the contrary, when the insured is being sued for negligent failure to provide security, 'occurrence' is defined by the immediate injury-producing act and not by the underlying tortious omission." Id. at 271. In interpreting the "repeated exposure" language in the definition of an occurrence, the court noted that "[t]he victims were not 'exposed' to the negligent failure to provide security. If the victims were 'exposed' to anything, it was the bullets fired from the intruder's gun." Id. at 268.

Other courts that have examined Koikos have been reluctant to accept its holding. The Supreme Court of Pennsylvania came to a different conclusion than the Supreme Court of Florida under similar facts in Donegal Mutual Ins. Co. v. Baumhammers, 938 A.2d 286 (Pa. 2007). In Donegal, the alleged negligence of Andrejs and Inese Baumhammers led to a multiple shooting incident by their son which resulted in the death of five individuals and the serious

bodily injury of a sixth. Id. at 152. The court had to determine whether the negligence of the Baumhammers constituted a single occurrence under the applicable insurance policy or whether each shooting qualified as a separate occurrence. Id. at 151-52. In finding a single occurrence, the court noted, "[w]e disagree with the application of the cause approach adopted by the Superior Court in the instant case and the Florida court in Koikos, and conclude instead that to determine the number of 'occurrences' for which an insurance company is to provide coverage, the more appropriate application of the cause approach is to focus on the act of the insured that gave rise to their liability." Id. at 162.[8] Further, in its opinion in Wilkie, the Eastern District of North Carolina declined to apply Koikos and distinguished it on the grounds that the facts in that case "involve[d] suit[] against an insured based on the insured's relationship to a third party *intentional* tortfeasor." Wilkie, 2007 WL 325694, at *4 (emphasis in original).

---

[8] Both Koikos and Donegal contain dissenting opinions on the issue in question. In Koikos, Justice Wells observed in dissent: "Based upon this policy and the facts that occurred at the time of this shooting, I believe that it is logically inescapable that there was but one occurrence." Koikos, 849 So.2d at 274 (Wells, J. dissenting). He further noted his belief that classifying the event as a sole occurrence "would align Florida with the majority of other jurisdictions on this issue." Id. at 276. In Donegal, Justice Cappy disagreed with the court's shift in focus when determining occurrences for purposes of triggering coverage and for purposes of coverage limits: "As to coverage, the majority examines the definition of an 'occurrence' in the Policy, focuses on Richard Baumhammers' violent acts, and determines that an accident, which qualifies as a covered occurrence under the Policy, took place because those acts were unexpected by the insureds. But then, to count the number of occurrences, the majority shifts its focus to the omissions of the Baumhammers that are alleged to be negligent, and states that '[b]ecause coverage is predicated on the Baumhammers' inaction, and the resulting injuries to the several victims stem from that one cause, we hold that Parents' alleged single act of negligence constitutes one accident and one occurrence.' This is inconsistent." Donegal, 938 A.2d at 297 (Cappy, J. dissenting) (internal citations omitted).

-25-

For its part, Mitsui Sumitomo has identified a litany of case law from other jurisdictions supporting the proposition that a single act or continuum of acts by an insured giving rise to liability constitutes a single occurrence, even in cases of multiple injuries and the intervening acts of third parties. (<u>See</u> Docket Entry 30 at 14-16 (citing, *inter alia*, <u>Westchester Surplus Lines Ins. Co. v. Maverick Tube Corp.</u>, 722 F. Supp. 2d 787, 795 (S.D. Tex. 2010) ("Under [the cause] approach, 'an insured's single act is considered the accident from which all claims flow.'") (quoting <u>Kansas Fire and Cas. Co. v. Koelling</u>, 729 S.W.2d 251, 252 (Mo. App. 1987)); <u>Fireman's Fund Ins. Co. v. Scottsdale Ins. Co.</u>, 968 F. Supp. 444, 447-48 (E.D. Ark. 1997) (treating improper preparation of food by insured as sole occurrence rather than insured's multiple sales or resulting multiple injuries as multiple occurrences); <u>Bomba v. State Farm Fire & Cas. Co.</u>, 879 A.2d 1252, 1255-57 (N.J. Super. 2005) (ruling that insured's negligent supervision, which resulted in numerous injuries, was one "occurrence"); <u>Atchison, Topeka & Santa Fe Ry. v. Stonewall Ins. Co.</u>, 71 P.3d 1097, 1123-24 (Kan. 2003) (deeming thousands of noise-induced hearing loss claims spanning many years as one "occurrence" because failure to protect employees from noise caused insured's liability); <u>RLI Ins. Co. v. Simon's Rock Early Coll.</u>, 765 N.E.2d 247, 251-55 (Mass. App. Ct. 2002) (holding that insured's conduct, not intervening acts of other parties, was appropriate focus in determining number of "occurrences").)

## c.  Application of the Cause Approach

As a court sitting in diversity, this Court must predict what the North Carolina Supreme Court would decide on this issue.  See Doe v. Doe, 973 F.2d 237, 240 (4th Cir. 1992); see also Wilkie, 2007 WL 3256947, at *5 ("This court must predict what would be the ruling of the courts of North Carolina if confronted by the same issue.").  The question then becomes how would that court apply the cause approach for purposes of determining the obligations of an insurer where the original negligence and the injuries happened months apart and involved conduct by multiple entities, including intervening negligence.

On the instant facts, a proper application of the cause approach (which the North Carolina Supreme Court would adopt) requires asking which negligent act, or continuum of negligent acts, on the part of the insured gave rise to liability.  From the facts stipulated in the instant case, liability arose on the part of Automatic Elevator from the allegedly negligent handling of the plastic barrels containing used hydraulic fluid in the Duke Health parking deck.  This act led to the hydraulic fluid's mistaken use as surgical cleanser on surgical instruments which were subsequently employed in a series of operations.  A finding that each of the 127 surgeries constitutes a separate occurrence would blur the line between the cause approach and the effect approach. Such a ruling thus would effectively ignore the North Carolina courts' explicit adoption of a cause rather than an effects standard, something this Court declines to do.

The decision in <u>Koikos</u> applies a broader view of insurer obligations than North Carolina courts have taken. It has been met with reluctance by at least one court applying North Carolina law to a multiple injury scenario, as well as by other state courts analyzing the number of occurrences under similarly complicated fact scenarios. <u>See, e.g.</u>, <u>Wilkie</u>, 2007 WL 3256947; <u>Donegal</u>, 938 A.2d 286. In this Court's view, a determination of the act of the insured giving rise to liability is more in line with prior decisions of the courts of North Carolina as well as a fair reading of the Policy between Mitsui Sumitomo and Automatic Elevator. This Court also finds persuasive the reasoning of the Eastern District of North Carolina in <u>Wilkie</u>, which looked to the negligence of the insured in determining the cause and thus the occurrence.

Finally, Duke has argued that a finding of a sole occurrence would conflict with the decision of the North Carolina Supreme Court in <u>Gaston Cnty.</u> which pinpointed the immediately preceding injury-causing event as the occurrence. 351 N.C. at 304. This Court disagrees. The facts of <u>Gaston Cnty.</u> suggest the court was applying the cause test to interpret the term occurrence for purposes of triggering coverage. In that scenario, the court would properly look to the more immediate cause of the injury. A determination in <u>Gaston Cnty.</u> as to whether the negligent manufacture of the vessel or the vessel failure was an occurrence for purposes of determining number of occurrences would have been moot, as either would have resulted in the insurer being obligated for only a single occurrence. Here, in contrast, the Court must

apply the cause approach to determine the number of occurrences as it relates to insurer obligations under specific policy limits. The Court concludes that, if the present issue were decided by the North Carolina Supreme Court, it would find but a single occurrence on the part of Automatic Elevator under the 04-05 Policy.

For the foregoing reasons, this Court concludes that the facts in the instant matter constitute a single occurrence under the cause approach as adopted by the courts of North Carolina.

## Conclusion

The Court has determined that (1) the facts as stipulated involve only the 04-05 Policy; (2) the 04-05 Policy Per Elevator Amendment does not apply as only one elevator was serviced during the 04-05 Policy period; and (3) there was a single occurrence for purposes of the 04-05 Policy's liability limits.

**IT IS THEREFORE ORDERED** that Plaintiff Mitsui Sumitomo Insurance Company of America's Motion for Summary Judgment (Docket Entry 29) is **GRANTED** and that (1) Mitsui Sumitomo does not have a duty to defend or to indemnify Automatic Elevator with respect to the Duke Indemnity Action under the 03-04 Policy; (2) the underlying claims of the Duke Indemnity Action involve one "occurrence" as defined under the 04-05 Policy, thereby capping Mitsui Sumitomo's obligations at the $1 million per occurrence limit of the 04-05 Policy; (3) as Mitsui Sumitomo has previously made $1 million available for the settlement of underlying claims (see Docket Entry 23, ¶ 25), the available limit under the 04-05 Policy has been exhausted; and (4) Mitsui Sumitomo has no further

duty to defend or to indemnify Automatic Elevator with respect to the Duke Indemnity Action under the 04-05 Policy.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment by Duke University Health System, Inc. (Docket Entry 27) is **DENIED**.


                              /s/ L. Patrick Auld
                         **L. Patrick Auld**
               **United States Magistrate Judge**

September 13, 2011